[Civ. No. 5927. Third Appellate District.—January 27, 1938.]

ALPHONZO E. BELL CORPORATION (a Corporation), Respondent, v. BELL VIEW OIL SYNDICATE et al., Respondents; EMMA J. ALEXANDER et al., Appellants [and Companion Cases].

G. P. Adams, Philip S. Dickinson, Hill, Morgan & Bledsoe, Kenneth K. Wright, Andrews & Andrews and Paul M. Gregg for Appellants.

Overton, Lyman & Plumb and Haight, Trippett & Syvertson for Respondents.

Sherman & Sherman, Austin C. Sherman, Thomas Reynolds, Willard W. Wallace and Sidney Cherniss, as *Amici Curiae*, on Behalf of Respondents.

PLUMMER, J.—The foregoing causes* were argued at one time, but were presented upon four different transcripts and

---

*REPORTER'S NOTE: See *post*, pp. 746, 747 and 748 [76 Pac. (2d) 166], for companion cases.

Incidentally, the rights of the Alphonzo E. Bell Corporation, a corporation, as owner of one of the tracts of land involved, and the rights of Emma J. Alexander et al., as owners of one of the tracts involved, and the rights of the Union Oil Company as lessee of the Alphonzo E. Bell Corporation, a corporation, the owner of one of the tracts, and likewise, the ownership or right to maintain the action by Emma J. Alexander et al., as owners of one of the tracts involved, lessors of the Union Oil Company, may be considered, the burden placed upon the court is considerably lessened by treating of the respective rights of owners and lessees in one opinion, rather than writing separate opinions involving the rights of lessors and lessees.

The premises involved are situate in what is known as the Santa Fe Springs Oil Fields in the county of Los Angeles. The situation of the respective tracts is shown by the diagram presented herewith:

The Alexander and Alphonzo E. Bell Corporation properties lie to the northward of the Bell View property. The Bell View property is indicated by a shaded panel. The Bell View property is a small tract 60 feet in width by 240

feet in length. The properties lie above what is called the Buckbee Zone, a strata of sand containing oil, gas and other hydrocarbons. The Buckbee Zone is somewhat cone-shaped, with the higher portion thereof under a line drawn easterly and westerly through the center of the Alexander and Alphonzo Bell properties. While spoken of as an oil pool, the Buckbee Zone has really no relation to what is understood ordinarily by the word ''pool'', but is a strata of sand underlying the properties mentioned, bearing the minerals above stated.

The appeals in the above-named cases are all based upon the decision of the trial court sustaining a demurrer to the plaintiff's last amended complaint to the complaints in intervention filed by Emma J. Alexander et al., and the complaint in intervention filed by the Union Oil Company. (For convenience we eliminated part of the names attached to the respective litigants.)

The gravamen of the respective actions circle around the alleged action of the owners and lessees of the Bell View properties in boring wells so as to intercept the Buckbee Zone oil strata or zone underneath the properties belonging to Emma J. Alexander et al., and Alphonzo E. Bell Corporation, both of which properties were and are under lease to the Union Oil Company. We have thus presented for consideration 1st: As to whether an action will lie for the recovery of oil, or its value, produced from property belonging to the plaintiff, Alphonzo E. Bell Corporation, also, belonging to Emma J. Alexander et al., and the Union Oil Company, as lessees thereof, where the defendants' wells have left the property belonging to the defendants' lessors and under lease to the Bell View Corporation; 2d: May adjoining owners, claiming that the wells entered into, and the oil was produced from their properties, intervene? 3d: Is such trespass a continuing one and subject to an injunction? 4th: The question of when the statute of limitations is tolled, owing to the fact that the trespass and the extraction of the oil alleged is a subsurface trespass and a concealed extraction and conversion of the oil obtained through wells which have departed from the vertical or from the premises under lease to the defendants and the oil obtained coming from the Alexander and the Alphonzo Bell properties; 5th: Is the

statute of limitations tolled, by a complaint, in favor of one interested as intervener but joined as defendant, for failure to join as plaintiff, but asking leave to join as intervener prior to the expiration of the statutory period? 6th: Is a statute constitutional which places a shorter limitation for action for oil taken by subterranean trespass than by surface trespass, and as to subterranean trespass makes the period absolute as to wells drilled prior to a certain date, and dependent upon knowledge of the agreed parties as to wells drilled subsequent thereto?

The record shows the filing of a number of amended pleadings and the asking of leave to file additional amended pleadings subsequent to the orders of the trial court sustaining demurrers without leave to amend. We omit listing the proceedings leading up to the sustaining of the demurrers, which we have just mentioned, for the reason that it would unnecessarily extend the length of this opinion.

The original complaint filed by the Alphonzo E. Bell Corporation and the pleadings filed by the interveners set forth the ownership of the respective parties and the leases executed in favor of the Union Oil Company. These pleadings all allege that two certain wells known as Bell View Grohs Well No. 2 and Bell View Grohs Well No. 3, are bottomed in the Bell property; that both wells have perforated areas lying within the subsurface of the Alexander property, and that oil has been, and is being extracted by the defendants from both properties. The pleadings contained allegations that the drilling by the defendants was secretly done, and under such circumstances that the plaintiff and interveners remained in ignorance of the fact that the wells were within the property just mentioned, and that the oil was being extracted therefrom, and that the discovery was made within such a date of the beginning of the actions that the statute of limitations was tolled. The value of the oil extracted by the defendants is set forth and judgment for its value is asked, and also, the pleadings contained a prayer for the issuance of an injunction to restrain the further extraction of oil through the wells just mentioned.

The reasons the acts of the defendants were not discovered immediately upon the sinking of the two wells, and were not discovered until within three years preceding the beginning of the actions, are set forth, and likewise, the concealment by the defendants of where the oil was being obtained,

and also, the misrepresentation of the defendants concerning their activities, when inquiry was made, are likewise alleged.

The size of the properties known as the Alexander Tract and the Alphonzo E. Bell Corporation Tract, is set forth showing that one tract contains about 40 acres and one tract contains something over 10 acres.

The deflection from the vertical of the two wells mentioned herein is likewise alleged, showing a deviation from the vertical of several hundred feet. The failure of the defendants to file a statement with the state division of oil and gas, as required, showing the depth of the wells referred to, is likewise alleged. The misrepresentation by the defendants as to the surveys of the two wells is also mentioned, and the failure of the defendants to show the deepening of the wells subsequent to their original boring or construction. As shown by the map the Alexander and Alphonzo Bell tracts are north and northeasterly of the Bell View Tract. The complaint alleges that the two wells involved were drilled by the defendants in such a manner as to depart from the vertical and extend to, and perforate the Buckbee Zone underneath the Alexander and Alphonzo Bell tracts, and that in doing so, the two wells depart from the vertical by several hundred feet; that the defendants had concealed that a directional survey had been made of the two wells so that the plaintiff and interveners did not discover the same, nor had any reason to discover the same, or to become acquainted with any facts which would have enabled them to acquire knowledge as to the wells so far departing from the vertical as to extend into the Buckbee Zone underlying the Alexander and Alphonzo Bell properties, until some time during the year 1935, when the plaintiff and interveners were informed that a directional survey had been made showing the facts as alleged in the complaint.

Based upon what we have heretofore stated, the right of the owners of the Alexander property and of the Union Oil Company as the lessee of the property owned by the Alphonzo Bell Corporation, a corporation, to intervene, appears to us so clearly and convincingly established that we need only cite section 387 of the Code of Civil Procedure. The language of that section is so plain and unambiguous that the citation of authorities and cases bearing upon the question

of intervention appears to be needless. Thus, without further comment we hold that the right of intervention existed in the parties mentioned as to the causes of action touched upon in any of the four cases now before us upon appeal. But the owners of the Alexander property and the Union Oil Company, under the section cited, were entitled to appear as interveners and join either the plaintiff or the defendants as they should elect.

The cases cited upon the various appeals are so numerous as to preclude the advisability of citing or analyzing more than simply those which may be considered as determinative of the issues presented for our consideration. Many of the cases relate to questions which are only incidental or collateral to the main issues, and though examined, need not be mentioned herein.

The first question presented which requires attention is whether the complaint or the complaints in intervention state a cause of action. The respondents have presented to us a theory upon which the cases should be decided, and which apparently was followed by the trial court in entering its orders from which appeals have been taken herein.

The theory of the respondents, and the theory upon which the trial court decided the demurrers as shown by excerpts from the opinion set forth in the briefs, is that an owner of property overlying a strata of sand impregnated with oil, gas and other hydrocarbons has a common right with every owner of surface overlying such strata of sand, to sink a well and take therefrom oil, gas and other hydrocarbons, irrespective of whether that well is contained within the exterior boundaries of the surface of the owner or departs therefrom to any extent so long as it extracts oil from the strata underlying any of the properties. The language of the respondents' brief is not just exactly in the words which we have used, but that is the force of the argument, even though couched in perhaps less plain and simple words.

The contention, otherwise stated, is that such a sand strata is common property from which any property owner is entitled to extract all the oil possible to collect, and which may come into the wells drilled by such surface owner, irrespective of where those wells are bottomed. Numerous cases are cited where the word "common" is used, and also where the words "correlative rights" are used, but so far as the

cases are concerned which have been presented to us for our consideration, and in so far as we have been able to discover the same, not a single case supports the doctrine that a surface owner has a right to sink his wells in such manner as to depart from perpendicular lines drawn from the exterior of the surface owned by the one sinking the well and departing therefrom in such a manner as ao extract oil which may be found underneath the surface of an adjoining owner.

In every case to which our attention has been called and which we have discovered for ourselves, the common right or the exclusive right is spoken of as to every surface owner to sink a well on his own property and extract from the subsurface beneath his surface tract of land, oil, gas and hydrocarbons. Not a single case supports the doctrine that wells may be so sunk by a surface owner as to depart from underneath his own lands and intercept oil, gas, or other hydrocarbons from beneath the surface of a neighboring owner. The common right and correlative right refer only to the fact that a surface owner is entitled to capture all of the oil, gas, and hydrocarbons that may, by hydro-static or other pressure be caused to impregnate the oil strata beneath his own property and reduce the same to possession by bringing them to the surface through wells drilled upon, and bottomed underneath his own surface location. The correlative right and the common right mentioned in the different cases is just the case which we have mentioned, and is not carried a single inch further. The fact that the doctrine of oil or gas in place cannot be applied with the same force and effect as veins of coal or ledges impregnated with gold or other minerals, as is held in such cases, does not impinge at all upon the doctrine of where the surface owner is entitled to capture and reduce to possession, oil, gas and other hydrocarbons by bringing the same to the surface. In so doing the well of the surface owner first drilled undoubtedly draws from the oil strata underlying the surface of adjoining owners a considerable portion of the oil, gas and other hydrocarbons that might be intercepted and brought to the surface by wells sunk upon adjoining properties. This is recognized as the common right by reason of the fact that the surface owner is entitled to capture such minerals while the same is found upon or in the oil

strata underneath his surface location. The oil, gas, and other hydrocarbons, for determining the rights of surface owners to bring the same to the surface, can only be considered in place while it is passing through the oil strata beneath the surface location. Every case discussing the question of oil in place recognizes that oil, gas and other hydrocarbons are beneath any particular surface location only for a limited portion of time, and comes more nearly within the doctrine applicable to the capture of wild animals as they pass from the lands belonging in the ownership of one person to lands belonging to some other person.

In following the doctrine of holding that minerals in place, as is applied to coal, gold and silver mining, inapplicable by reason of the fact that oil, gas and other hydrocarbons are only temporarily underneath a surface location, there is no intimation whatever that it was, or is intended by the courts to establish a doctrine that would enable anyone owning a surface location, to extend or to drill a well so as to capture either oil, gas or other hydrocarbons and bottom such wells anywhere other than beneath his own surface location.

The theory further advanced by the respondents, and accepted by the trial court, is that the owner of a surface location has a common right to sink wells and withdraw from the oil strata his proportionate share of what is called the "oil pool", or "common property" underneath the various locations, or rather, from the sands lying within the total oil zone. This contention, of course, overlooks the fact that there are no means of determining what would be a surface owner's proportionate share. The statement of the theory contradicts itself and shows the fallacy of the proposition.

The Alexander property and the Alphonzo E. Bell property lie relatively over the top of the Buckbee Zone, and are therefore in a much more favorable position for the capture of oil, gas and other hydrocarbons than properties located nearer to the exterior boundaries of the zone. This arises from the fact that the impregnation of water renders the capture of oil from any well less commercially valuable by reason of the fact that the hydro-static pressure fills the well with water and chokes off the gas and oil. It is therefore more desirable on the part of one drilling a well to drill what is called "up-structure" instead of "down-structure", and thus reach a portion of the underlying sand strata

or oil zone which will enable the well to have a much longer life.

■ The wells in question were originally drilled some time during the years 1928 and 1929, and while, as stated in the case of *People* v. *Associated Oil Co.*, 211 Cal. 93, 107 [294 Pac. 717], courts are entitled to take judicial notice of the condition and development of the petroleum industry, and said court may also take judicial notice of matters of science and common knowledge and of the physical and economic laws governing oil and gas production, it does not follow that the courts will or may take judicial knowledge of whether any particular well is drilled vertically, or whether it departs therefrom, or in what direction it will depart.

While a number of cases have been cited on the question of what the courts may or should take judicial notice, the fact that the courts do not, and cannot, from the very nature of the situation, take judicial knowledge of the direction from which a well may depart from the vertical as it is being drilled, is a complete answer to all the arguments presented by the respondents of what courts may take judicial notice, and the question of what the courts will or may take judicial notice, need not be further considered. There is only one way, as shown by the cases under consideration, to determine the direction in which a well has departed from the vertical, and that is by a survey of the particular well under consideration.

■ While we have been favored with a supplementary brief as to the opinions of experts with relation to the tendency of wells departing from the vertical, and while it would appear that the greater number of the wells considered, departed from the vertical, it also appears that wells were surveyed where the departure from the vertical was practically negligible. This, again, absolutely controverts the argument advanced by the respondents that the mere drilling of a well is sufficient to put adjoining owners upon notice that something is being done which will surely, or may reasonably be expected or anticipated to invade the property of adjoining owners, and destroys one of the foundation pillars upon which the respondents argue that the statute of limitations began to run at the time the wells under consideration were being drilled.

It appears from the supplementary brief furnished by the respondents that it was practical, and by taking the then known means of drilling wells, a well could be kept so nearly vertical as not to encroach upon the properties of adjoining owners. The fact also appears in the record that in the early history of the production of oil, and upon properties where the sides and end lines were distant from the surface location of the well, the necessity of drilling a well as nearly perpendicular as possible did not exist. For a number of years, however,—the number of which does not appear in the record,—it has been possible for owners of surface tracts to drill what are called ''side line'' wells, in order to protect their own properties from having the oil, gas and other hydrocarbons thereunder extracted by wells on adjoining properties.

The respondents set forth that the allegations in the pleadings show that the defendants well knew it was probable that the wells being sunk on the Bell View property would enter the premises of others, and that the defendants were required to use such care as was necessary to prevent the wells from departing from within the confines of the Bell View property raises the question of a knowledge that such wells so departed, and therefore started the running of the statute of limitations. Such a conclusion, however, is illogical. All such allegations show is what the defendants knew, and should have taken precautions to drill their wells in such a manner as not to materially depart from the lines of their own property, and not that the plaintiff or the interveners knew, or had any reason to know that the defendants would not take the ordinary and usual precautions to capture oil from beneath the Bell View property, and that oil would be sought at such locations where due regard to the rights of others would not be violated.

Again, the contention that it does not appear from the pleadings whether the wells were drilled in accordance with the generally accepted and prevailing art and drilling practice at the time the wells were drilled, presents no logical basis upon which to found an argument that the complaint or pleadings filed by the interveners is defective.     The mere fact that the drillers of other wells and the owners of adjoining properties may have so drilled their wells as to bottom the same where they had no right to lay the

bottom of their wells, and extract oil that belonged to others, is no excuse whatever for the alleged actions of the defendants, if it be assumed that they drilled their wells and bottomed the same for the purpose of capturing oil, gas and other hydrocarbons wherever the same could be obtained, irrespective of the rights of adjoining owners. The argument of the respondents, by the mere statement thereof, is shown to destroy itself. The fact that the Bell View property covered a surface tract of only 60 by 240 feet, established only the correlative fact that the defendants, drilling wells starting upon such a limited area, were under obligations to see that their wells did not drift so as to intercept oil passing underneath the properties of other owners, and that their right, or their correlative right, or common right of capture necessitated wells as nearly vertical as possible. The words "common supply" as used in the respondents' briefs, is a misnomer. The "common supply" is not true as applied to different portions of the strata of sand known as and called Buckbee Zone. That it is a common strata of sand or oil zone may be admitted, but the supply which different owners may capture, and have a common right of capture, differs very materially as to where the wells are drilled so as to intercept the strata of oil-bearing sand called the Buckbee Zone. As we have shown, the farther up the structure a well may be drilled, the greater will be the supply. Such an owner is in no sense of the word limited to his proportionate share, as argued by respondents and accepted by the trial court. Such an owner has been held, over and over again, to be entitled to all the oil, gas and other hydrocarbons he can capture through the wells so located.

The "common right" or "correlative right" mentioned by the courts in *Bandini Petroleum Co.* v. *Superior Court,* 110 Cal. App. 123 [293 Pac. 899], and *People* v. *Associated Oil Co., supra,* does not mean that the correlative right, or common right, or common supply mentioned in either one of the above cases gives the right to bottom one's well wherever he sees fit. The common supply, or common right, or correlative right is expressly limited to the right of each individual surface owner to take from the oil strata lying beneath his properties, oil, gas and other hydrocarbons intercepted by wells sunk beneath his own property, in such a manner as not to commit waste. Those cases involve the application of the police power of the state. The production of oil and

gas is the bringing to the surface and preparing for utilization by the public of substances in which all of the people of the state are vitally interested, and therefore, such production, by reason of public policy, may be controlled or limited or required to be conducted in such a manner as to yield the greatest possible return, and thus conserve the public welfare and benefit. The commercial life as well as the domestic life of every citizen of the state of California is so vitally bound up and connected with the production of oil and gas as to bring the same within the purview of the police power of the state. Such is the extent and logical conclusion only to be drawn from the two cases above mentioned, relied upon by the respondents as their right to capture oil, gas and other hydrocarbons at any place where they may see fit to bottom their wells.

In support of the doctrine advanced by the respondents a quotation is taken from the case of *People* v. *Associated Oil Co., supra,* which appeared in substance in the case of *Ohio Oil Co.* v. *State of Indiana,* 177 U. S. 190 [20 Sup. Ct. 576, 44 L. Ed. 729], as follows: ''The decision in that case defines the so-called correlative right not necessarily as a right to a fixed distributive or proportional share of the oil and gas underlying the surface, which no other owner of soil overlying the same reservoir may take and use beneficially, but as a coequal right to take whatever of the oil and gas can be captured, so long as waste, as defined by the statute, is not committed.'' An examination of the Ohio Oil Company case, *supra,* shows that this statement was relative to the right of a surface owner to sink a well upon his own property and take from the oil sands lying beneath his property all the oil, gas and other hydrocarbons as may be so captured. Later on this will be shown by a quotation from the Ohio Oil Company case. Nothing in either one of the cases supports the doctrine that the owner of a surface location has a right to take from the so-called oil reservoir, oil that is not captured, or gas that is not captured, or hydrocarbons that are not captured beneath his own surface location.

The cases which we have referred to and which we will consider later on do not establish any such principle as comes within the terms ''common ownership''. There is no such ownership. It is simply a common right or a correlative right to capture all the oil, gas and other hydro-

carbons that may be captured in wells sunk beneath one's own property. There is, in fact, no ownership of the oil and gas or other hydrocarbons not found beneath one's own property and brought to the surface and reduced to possession. This again controverts the asserted right of the respondents to capture such substances wherever they may be found.

Further, it is alleged that the pleadings do not show that the wells so allowed to depart from the vertical drew more oil from what is called the "common supply" than would have been obtained had the wells been drilled vertically; that is, that the Alexander property and the Alphonzo Bell property, and the operations of the lessee thereof produced less oil than would otherwise have been produced and reduced to their possession. This contention is absolutely without merit. If the respondents had no right to trespass upon the property of the plaintiff or interveners and extract oil and gas therefrom, under the decisions the respondents never acquired any ownership of such gas and oil, and as the cases cited hereafter show, the lessors and lessee are entitled to a judgment against the respondents for the value thereof, measured according to the circumstances of whether such wrongful taking was intentional or unintentional. The trial court's acceptance of such a doctrine was and is clearly erroneous.

The principle of the respondents, and apparently accepted by the trial court, is "that the owners of all the land embraced within the boundaries of an oil reservoir, between various points in which the oil may migrate, own all the oil in that reservoir as tenants in common". This principle has no support in a single case called to our attention. When properly interpreted the cases cited in support of the alleged principle simply hold that the owners of the surface have a common right to drill wells beginning on their own properties, so as to capture and reduce to possession all the oil, gas and other hydrocarbons that may be passing through the sands underlying such surface location. The "common reservoir" means the sand strata through which oil, gas and other hydrocarbons may be passing, and is in no sense a stationary reservoir, to which each surface owner, as a tenant in common, owns a particular portion thereof. That the surface owners have a common and correlative right to take from such sand strata, oil, gas and other hydrocarbons pass-

ing through the sands underlying his surface location, is all that the cases mean when they speak of extracting oil, gas and hydrocarbons from a common source. It is common to the extent that every surface owner has a right to reduce to possession all of the oil, gas and other hydrocarbons that may be intercepted by a well drilled upon his own property, and does not mean that he has any ownership in oil, gas and other hydrocarbons that may have passed through the sands underlying his own property and into the sands underlying neighboring locations. As thus limited, the terms "common source", "common supply" and "correlative rights" may be said to have been clearly and definitely established.

Three propositions are set forth in respondents' brief upon which the trial court apparently based its decision sustaining the demurrer to which we have made reference: "1st. That because of being bottomed underneath the surface of plaintiff's land, defendant's well has extracted more oil and gas than it could have removed from the reservoir had it been bottomed within the lines of defendant's own property, that excess measuring the damage to all the other common owners of the reservoir; 2nd. That plaintiff, if not the only other owner in common of the reservoir, has himself been able to capture through his wells less oil than he would have captured if defendant's well had struck the reservoir within defendant's own property. . . . The third amended complaint in this action does not show these facts, nor either of them, and thus . . . fails to show an injury with which the courts should be concerned."

As shown by the cases which we will hereafter cite, not one of these propositions is tenable; they overlook entirely the fact as to where, under the law, correlative rights, a surface owner must bottom his own wells. In other words, the extent of the injury to the plaintiff is not measured by the oil that might have been captured by the plaintiff or his lessee, or by the intervener, but by the oil, gas and other hydrocarbons taken by the respondents from underneath properties belonging to the plaintiff, or the interveners. That is the extent of the damage. The respondents have gone where they had no right to go to bottom their wells, and have taken oil, gas and other hydrocarbons belonging to persons other than the defendants, and the value thereof is the damage to the other persons, and the value thereof is

the measure of such damage, not that the plaintiff or the interveners might have captured more oil, gas or other hydrocarbons if their wells had first intercepted the locations where the respondents bottomed their own wells.

The case of *Dabney-Johnston Oil Corp.* v. *Walden*, 4 Cal. (2d) 637 [52 Pac. (2d) 237], supports no such principle as that advocated by the respondents and adopted by the trial court.

We do not need to discuss the injury to the real estate, as these actions are not based upon damages suffered to the real estate but are based upon the wrongful conversion of oil, gas and other hydrocarbons from beneath the property known as the Alexander and Bell locations leased to the Union Oil Company.

The case of *People* v. *Brunwin,* 2 Cal. App. (2d) 287 [37 Pac. (2d) 1072], while being a criminal case and showing circumstances from which we conclude that the wells were surfaced above barren properties and extended into oil and gas producing zones, differs somewhat from wells surfaced on land lying above oil and gas producing stratas, yet, if the doctrine of ownership and correlative rights, as we have set them forth, was not in principle accepted by the trial and appellate courts, no offense could have been alleged as committed, because in order to constitute grand theft, an owner of the property stolen must be made to appear, and if the oil, gas and other hydrocarbons purloined by the defendants in that case did not belong to the surface owners when brought to the surface and reduced to possession, then and in that case the defendants would have been purloining property belonging to no one.

As we will show hereafter by the cases cited, that no one has a right, by reason of the ownership of a surface location lying above an oil zone, to extend his oil wells without the boundaries of his own surface location, vertically, extended downward so as to trespass upon the premises of adjoining owners, a cause for an injunction to stop the trespass, or the conversion, rather, of oil, gas and other hydrocarbons by such means is stated, and an injunction should be granted. Likewise, the cases hereafter cited will show that all the parties involved herein either as plaintiffs or interveners, have a right of action whether lessors or lessees, royalty owners, or owners as lessees. The Union Oil Company is clearly shown not to have converted the oil, gas and

other hydrocarbons to its own uses and purposes in violation of the rights of the royalty owners, but such rights have been violated according to the allegations of the complaint, which, of course, must be taken as true upon this proceeding by the action of the respondents. They are the ones who have committed the injury, are guilty of the conversion, and anyone injured by such conversion has a cause of action and properly may join either as plaintiffs or defendants, all others having an ownership or interest in the property alleged to have been converted by the respondents.

Outside of the cases hereafter cited, one question answers, in the affirmative, we think conclusively, the contention of the respondents as to the right of the owners of the Alexander property to intervene: Who has converted the property from which the owners of the Alexander location are entitled to receive either oil, or its money value, as royalty? Common logic shows absolutely without citation of authority, the right of the one who has thus been wronged is against the wrongdoer. The Union Oil Company as lessee has not been guilty of any conversion. That it has also been wronged and has a cause of action does not bar the right of the owners of the Alexander property to intervene under section 387 of the Code of Civil Procedure, as an interested party, to establish and maintain their own right and seek redress for the injury suffered through the hands of the respondents in converting the oil, gas and other hydrocarbons as alleged in the pleadings.

Reverting again to the case of *People* v. *Brunwin, supra,* and as a further answer to the respondents' contention that that case does not support the rule that taking oil from underneath the surface location of another owner is not wrongful, we quote from the Brunwin case the following language, which shows the conclusion of the court after citing the case of *Western Oil Co.* v. *Venago Oil Corp.,* 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271] : ''If, under the rule announced in this decision, a lessee of land having the right to drill for and reduce to possession oil in the ground, has such a title to the oil in place that he can sell and transfer it and the transfer becomes immediately effective, no good reason is apparent why the right conferred upon him by the lease is not such that he is entitled to complain when a trespasser enters upon the leased premises and severs

from the realty the very thing which is the real substance of the lease. In *Bartholomae Oil Corp.* v. *Delaney,* 112 Cal. App. 314 [296 Pac. 960], it was decided that the lessee of land under a lease which gave such lessee the exclusive right to drill, develop and remove petroleum from the ground may maintain an action to quiet title to the leasehold interest and to the oil in place. In *Mexican Gulf Oil Co.* v. *Compania Trans. D. P. S. A.,* 281 Fed. 148, 163, the plaintiff sought to recover damages from the defendant for the taking of 6,000,000 barrels of oil from certain land in Mexico upon which the plaintiff claimed to have an exclusive right to drill for oil. The plaintiff was given judgment for the value of the oil taken. Certain language in the opinion bearing upon the question of the ownership of the oil in place is apropos of the problem which is being here considered. The court said: 'The argument of the defendant is that oil being a fugacious element is not owned by anyone until it is brought to the surface; the owner of the land does not own it if he has given the exclusive right to explore to another; that other cannot recover if he was not in possession of it. Such a result seems to me so unjust as to make the reasoning which leads to it wrong.' "

The principle of ownership necessarily affirmed in the Brunwin case is not changed because the cases tendered for our consideration are civil rather than criminal in their nature.

That the doctrine that surface owners over a strata of sand-bearing oil, gas and other hydrocarbons has a right to take oil therefrom at any place where such strata may be intercepted by his wells has no basis in law, we cite the following cases. (Parenthetically, we may state that no cases have been called to our attention which controvert the rulings had in the actions to which we now refer) :

Beginning with the early case of *Bender et al.* v. *Brooks et al.,* 103 Tex. 329 [127 S. W. 168, Ann. Cas. 1913A, 559], where a similar question was considered as is presented to us for determination, the court said: "Appellants had the exclusive right, as owners of the soil, to take oil therefrom, and the appellee, by an invasion of their right and removal of the oil, no matter how innocent, could not acquire title thereto. It follows logically that since appellants owned the land from which Brooks extracted the oil, the oil so re-

moved became and was the oil of the appellants so soon as it reached the surface. Therefore, they had a right to recover their property or its value. There is no conflict in the authorities upon the proposition that the minerals in the land continued to be the property of the landowner after it was removed from its bed or place in the soil.'' The court then goes on to consider whether the trespass and conversion of the oil was intentional or unintentional in order to determine the amount of damages to be awarded.

A leading case dealing with the ownership of oil, gas and other hydrocarbons is that of *Ohio Oil Co.* v. *State of Indiana,* 177 U. S. 190 [20 Sup. Ct. 576, 44 L. Ed. 729], from which we quote the following: ''Petroleum gas and oil are substances of a peculiar character, and decisions in ordinary cases of mining for coal and other minerals which have a fixed situs cannot be applied to contracts concerning them without some qualifications. They belong to the owner of the land, and are a part of it so long as they are on it or in it, or subject to his control, but when they escape and go into other land or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas extending under his neighbor's field so that it comes into his well it becomes his property. (*Brown* v. *Vandergrift,* 80 Pa. 142; *Westmoreland etc. Natural Gas Co.* v. *DeWitt,* 130 Pa. 235 [5 L. R. A. 731, 18 Atl. 724].)'' Further on, in stating the rights of the owner of the surface, the court says: ''Although in virtue of his proprietorship, the owner of the surface may bore wells for the purpose of extracting natural gas and oil, until these substances are actually reduced by him to possession, he has no title whatever to them as owner; that is, he has exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession.''

It will be noted that the owner of the surface is confined to the exploration or drilling to obtain oil and gas to his own land, and to do so, having the exclusive right, necessarily precludes the right of any other person to drill a well so as to bottom the same under the surface of an adjoining or other landowner. Further on in the same opinion the court says: ''The owner of the soil has exclusive right to reduce to possession the deposit of natural oil and gas found be-

neath the surface of his land.'' Comment by us upon this language would not add to the force and effect of what we have just quoted, which seems to us conclusive.

To the same effect is the case of *Rich* v. *Doneghey*, 71 Okl. 204 [177 Pac. 86, 3 A. L. R. 352], where the Supreme Court of Oklahoma was considering, among other questions, the exclusive right of lessees to drill and extract oil from leased premises.

The latest case on the subject appears to be that of *Union Oil Co. of California et al.* v. *Mutual Oil Co.*, 19 Cal. App. (2d) 409 [65 Pac. (2d) 896], where judgment was awarded the plaintiffs, which appears to have included both the lessors and lessees, the value of oil, gas and other hydrocarbons extracted by the defendants from beneath the surface of the lands owned or leased by the plaintiffs. The right to recover the value of the oil, gas, etc., was sustained, but with the rule of determining the value thereof, we are not now interested. The court said: ''The question of whether the well was intentionally or unintentionally drilled so as to slant into plaintiffs' premises, is immaterial here. In either case a trespass was committed in the drilling of the well, and the trial court further found, 'that the maintenance of said Carpenter No. 1 Well and the production of petroleum therefrom constituted a continuing trespass' upon plaintiffs' premises. It also found that in the production and sale of the petroleum from said well, defendant Mutual Oil Company acted not only on its own behalf but also as the agent of the appealing defendants. Thus the appealing defendants were chargeable with trespass as well as conversion by reason of the acts of their agent, Mutual Oil Company, for 'neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action.' '' (Citing a number of cases.) '' . . . On their contention that plaintiffs were not entitled to an accounting and judgment for the value of the oil produced and sold by the Mutual Oil Company as the agent of the appealing defendants, numerous authorities are cited on the general proposition that neither the owner of real property nor his lessee has absolute title to 'oil in place'. This may be conceded. (*Callahan* v. *Martin*, 3 Cal. (2d) 110 [43 Pac. (2d) 788, 101 A. L. R. 871]; *Western Oil etc. Co.* v. *Venago Oil Corp.*, 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271].) The questions here are: (1) Were the

lessees under a lease granting to them the exclusive right to explore and remove oil from the premises entitled to recover from a trespasser the value of the oil removed by such trespasser from said premises and converted to the trespasser's use during the term of the lease; and (2) if such lessees were entitled to recover the value of the oil so removed, was it proper for the trial court in granting injunctive relief to also grant relief by way of an accounting and a money judgment for the amount found to be due from a trespasser?'' These questions were resolved in favor of the plaintiff. The court in the case from which we have been quoting, refers to *People* v. *Brunwin, supra,* in support of the contention that the owner of the surface premises has the exclusive right to explore for and remove oil and gas that may be found beneath such premises. A hearing by the Supreme Court was denied on May 1, 1937.

In *Bandini Petroleum Co.* v. *Superior Court, supra,* the court supports the rule giving exclusive right to a surface owner to explore for and extract gas and oil from beneath such location, and in doing so, uses this language: ''We think, however, that the better reasoning, on account of the self-propelling or migratory character of natural gas, as well as oil, dictates the conclusion that while in general we may speak of the owner of the surface as being the owner of the gas and oil in place, what we really mean is that he, and he alone, has the right, through his own property, to endeavor to reduce the substances to possession; that when they are reduced to possession, and then only, does he have an absolute and unqualified title thereto.'' The right to bore for such oil and gas is confined to the surface owner. The court in the opinion from which we have quoted states the rule as follows: ''It is the property of anybody who can acquire the surface right to bore for it.''

The rule from which foregoing cases and others may be stated is as follows: The owner of the surface has exclusive right to reduce to possession all the oil gas, migratory or otherwise, that may be found in the soil beneath the surface premises owned by the one exploring and drilling for the purpose of reducing to his possession oils and gases in such premises, or that may seep into the wells so drilled and operated where the well is bottomed beneath the surface location. This, of course, necessarily excludes the right of

any other person to invade the subsurface and extract oils, gases or other hydrocarbon substances beneath the surface premises owned by another.

In the case of *People* v. *Associated Oil Co., supra,* while dealing with many other questions, and relied upon by the respondents, the rule is supported giving exclusive right to the surface owner to capture the gases and oils that may be found beneath the surface. This appears by the following excerpt: "They (referring to oil and gas), belong to the owner of the land, and are a part of it so long as they are on it or in it or subject to his control, but when they escape and go into other land or come under another's control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil, or gas, extending under his neighbor's field so that it comes into his well, it becomes his property." A number of cases are cited in support of this statement.

While in *Callahan* v. *Martin, supra,* the court holding that the doctrine of minerals in place as referred to coal and other stationary products is not applicable to oil and gas, supports the exclusive right of the appellants, and announces the rule in these words: "But other cases unequivocally declare that the owner of land does not have an absolute title to oil and gas in place as corporeal real property, but, rather, the exclusive right on his premises to drill for oil and gas and to retain as his property all substances brought to the surface on his land."

The case of *Dabney-Johnston Oil Corp.* v. *Walden, supra,* affirms the exclusive right of the surface owner to drill on his own land and to capture the oil and gas that may be found thereunder. This case goes on to define the profit or interest of lessors and lessees in gas and oil, which is not material for us to here consider.

We do not deem it necessary to add further citations or quote from other opinions, as we think what we have said establishes the exclusive right of the surface owner to explore for and capture the oils, gases and other hydrocarbons that may be found within the exterior lines of his surface premises extended vertically downward. No case has been called to our attention, and we have been unable in our investigations to find any case controverting the rule upheld in the foregoing citations.

As to the right of the plaintiff and the interveners as well to maintain these actions, we may call attention to the fact that the leases provide for the delivery of a certain percentage of oil to the owners, and that the ownership of the lessors to the royalty oil is affirmed and reaffirmed, and that the right of the lessee to drill for, appropriate or sell the oil is expressly made subject to the delivery of the royalty oil.

As supporting the right of the lessors to maintain the action or to become parties thereto, we may cite the case of *Mathew* v. *Mathew*, 138 Cal. 334 [71 Pac. 344], and also the case of *Mason* v. *United States*, 260 U. S. 545 [43 Sup. Ct. 200, 67 L. Ed. 396]. And the right to maintain an action for the conversion thereof is likewise supported in the case of *Lusitanian etc. Dev. Co.* v. *Seaboard etc. Corp.*, 1 Cal. (2d) 121 [34 Pac. (2d) 139].

Other cases supporting the right of lessors to maintain actions for the conversion of royalty oil might be cited, but what we have said we think sufficient, though we will call attention further to the cases of *Hall* v. *Southern Pac. Co.*, 40 Cal. App. 39 [180 Pac. 20], and *Stackpole* v. *Pacific G. & E. Co.*, 181 Cal. 700 [186 Pac. 354].

Under the facts pleaded are the actions which we are considering barred by the statute of limitations?

■ In the consideration of this question our attention has been called to a certain affidavit purporting to set forth facts sufficient to put the plaintiff and interveners upon notice. This affidavit, or rather, what the affidavit has stated therein, would, we think, constitute pertinent evidence to be considered by the trial court in determining whether the plaintiff and interveners should have discovered the trespass and conversion of oil earlier than within the three-year limit preceding the commencement of the actions, but upon these appeals we are confined to the pleadings, and not to the evidence which may be submitted or introduced upon the trial of the respective actions.

■ In addition to what we have said, the pleadings contained the following allegations as to discovery and knowledge, to wit:

That in March, 1934, the plaintiff and interveners learned that Bell View Grohs Well No. 2 and Bell View Grohs Well No. 3 had been so drilled as to penetrate the subsurface of

the premises owned by the Alexander people and also by the Alphonzo E. Bell Corporation, and that said wells were bottomed beneath such properties. In 1935, the plaintiff and interveners first learned that a directional survey had been made by the Bell View people; that prior thereto, when questioned by officers of the Union Oil Company, the Bell View people had denied that any such directional survey had been made, when, as alleged in the pleadings, such a survey had been made; that the logs kept by the Bell View people were concealed and had not been inspected until an order for inspection was made by the court. It is also alleged that the depth of the wells were not truly stated, and that incorrect reports were made to the state division of oil and gas, which would disarm anyone interested from suspecting that the oil and gas being produced by the Bell View people came from other than their own property. The nature of the conditions involved and presented of the properties upon this appeal introduce the question of natural concealment, which we think shows that the statute of limitations did not begin to run at the time contended for by the respondents, to wit: at the time of the bottoming of the wells within the premises, and the beginning of taking oil from the Alexander and Alphonzo Bell properties.

While the appellants cite the case of *Liles* v. *Producers' Oil Co.*, 155 La. 385 [99 So. 339], and *Findley* v. *Warren*, 248 Pa. 315 [94 Atl. 69], that recovery may be had for the value of the oil extracted within three years preceding the beginning of the action, we think the pleadings are sufficient to carry the period of recovery back to the time of the beginning of the extraction of oil and gas through the Bell View wells. Considering that these cases are governed by what is said in *Lightner Min. Co.* v. *Lane*, 161 Cal. 689 [120 Pac. 771, Ann. Cas. 1913C, 1093], we deem it unnecessary to extend the length of this opinion by analyzing the cases upholding that the statute does not begin to run to bar an action for a continuing trespass or conversion as that principle is stated in cases for the abatement of a nuisance.

The contention of the respondents that the surface operations carried on on the Bell View properties constituted a visible notice to the plaintiff and interveners of a possible or probable trespass upon properties belonging to the plaintiff and interveners is untenable. The presumption that no

one intends to violate the law or take from and convert the property of another is a direct answer to any such contention. The court certainly cannot take judicial notice that the surface operations in drilling an oil well is an indication that the parties drilling the well intend to convert to their own use properties belonging to other people. In other words, there is absolutely nothing in the mere fact of drilling and operating a well by one person to indicate to another that such other person's rights are being invaded. The whole proceeding is a concealed operation by the wrongdoer. The language used in the Lightner case, *supra,* is pertinent here. Referring to the case of *Bulli C. M. Co.* v. *Osborne,* L. R. App. Cas. 351, we find the following: "The court also declared that to constitute a fraudulent concealment of such a trespass it was not necessary to show that the wrongdoer had taken active measures to prevent detection. It is one of the cases where the fraud concealed itself."

In the present case the pleadings show active measures taken to prevent discovery of the sources from which the oil, gas and other hydrocarbon substances were being obtained.

In further considering the question of concealment it is said in the Lightner case, *supra:* "Such an act, so committed, has all the substantial elements of fraud. Where one, by misrepresentation, induces another, knowingly, to part with his property, because his mind is so beclouded by the falsehood that he is unaware of the wrong done him, it is called a fraud. It is a taking of another's property without his knowledge of the fact that it is really taken from him. The ignorance in that case is produced by artifice. Where one betrays a trust and appropriates trust property to his own use, it is called a fraud. The injured party allows the other to have the possession and the opportunity to convert the property secretly, because of faith and confidence in the wrongdoer. In the case of underground mining of a neighbor's ore, nature has supplied the situation which gives the opportunity to the trespasser to take it secretly and causes the ignorance of the owner. Relying upon this ignorance, he takes an unfair advantage of his natural opportunities and thereby clandestinely appropriates another's property while appearing to be making only a lawful use of his own. The act in its very nature constitutes the deceit which makes it

a fraud. It is a daily false representation that the ore he is taking is his own, with full knowledge that it belongs to another, and that that other is deceived by the artifice.''

In the case at bar the very nature of conditions presented show a continued concealment on the part of the Bell View operators. They were not only operating or conducting a proceeding by which nature furnished all the elements of concealment, but made incorrect statements when inquiries were made which, if answered correctly, would have led to the discovery of the conversion of the oil and gas, and likewise made, according to the allegations in the complaint, incorrect statements to the state division of oil and gas which would tend to disarm suspicion.

In 37 American Law Reports, beginning on page 1182, are quoted a number of cases supporting the rule which we think applicable here, that the statute of limitations begins to run only from the date of the discovery of the wrongful conversion of the oil and gas by the Bell View operators.

In the case of *Lewey* v. *H. C. Frick Coke Co.*, 166 Pa. 536, 538 [31 Atl. 261, 28 L. R. A. 283, 45 Am. St. Rep. 684], a case where the plaintiff had not mined his own land and had no means of knowing that the defendant had extended his operations beyond his line, it was held that the running of the statute of limitations against a cause of action for removal of coal from a stratum beneath the surface of land, by wrongfully extending a mine under lands of other owners, begins only to run from the time of actual discovery. The court in that case also goes on to state that the natural con· ditions brought into bearing the principle of concealment.

We do not need to quote further from the cases contained in the extended note, but will confine ourselves to the simple statement that the rule is well supported that the statute does not begin to run until the discovery of the conversion by the secret means of underground operations.

All the cases having to do with surface trespassers necessarily involve the rule of visible notice, of which every person is supposed to acquire sufficient information to put himself upon further inquiry as to whether his rights are being invaded. In other words, the rule of permanent and visible structures has no application whatever to underground and secret operations, in beginning the operation or application of the statute of limitations. By the very nature of the

underground operations, the fraudulent conversion of another's property continues to be a fraudulent conversion of such property every day that it is continued, and the statute never begins to run unless there are certain circumstances which lead to the discovery of the fraudulent conversion.

In further consideration of the statute of limitations, the constitutionality and application of section 349¾ of the Code of Civil Procedure is discussed by counsel for both appellants and respondents. The record shows, however, that all of the parties were before the court preceding the expiration of the one hundred eighty days mentioned in the section of the code just referred to. The Union Oil Company had appeared, filed a petition for leave to intervene, but as actual leave was not granted by the court until after the expiration of the one hundred eighty days, the right of the Union Oil Company could not be prejudiced by the failure of the court to act upon the application prior to the expiration of the one hundred eighty days. The Union Oil Company had appeared in the case within the one hundred eighty days, and that we deem sufficient. This relieves us from any discussion as to the validity or invalidity of section 349¾, *supra*.

We do not find anything in the special demurrers which really affects the merits of the cases under consideration, and therefore will not extend the length of this opinion by analyzing the same in detail. Nor does there appear to be anything of merit in the contention of laches urged by the respondents.

From what we have set forth herein, it necessarily follows that the orders of the trial court sustaining the demurrers to the pleadings of the plaintiff and the interveners are all erroneous; likewise, the orders denying the privilege to file additional pleadings as tendered by the respective parties.

The judgment of dismissal in the case in which we are writing this opinion, Civil No. 5927, is reversed, and the cause remanded to the trial court to overrule the demurrers interposed by the defendants, and to grant leave to the plaintiff and interveners to file additional pleadings, if so advised, giving to the respondents such time as may be just to file answers thereto. Corresponding orders will be made in each one of the other cases mentioned in the opening portion of this opinion.

Pullen, P. J., and Thompson, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 28, 1938.